# 25-2539

## United States Court of Appeals for the Second Circuit

SHERRY ANN MURRAY,

*Plaintiff-Appellant,*

-against-

NEWREZ LLC DBA Shellpoint Mortgage Servicing,
PHH MORTGAGE CORPORATION DBA PHH Mortgage Services,

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

# BRIEF FOR PLAINTIFF-APPELLANT

PETROFF AMSHEN LLP
*Attorneys for Plaintiff-Appellant*
1795 Coney Island Avenue, Third Floor
Brooklyn, New York 11230
(718) 336-4200
*samshen@petroffamshen.com*

Dick Bailey Service INC
APPELLATE SERVICES
www.dickbailey.com

# TABLE OF CONTENTS

**_Page_**

TABLE OF AUTHORITIES ........ *iii*

JURISDICTION ........ 1

ISSUES PRESENTED ........ 2

INTRODUCTION ........ 3

STATEMENT OF THE CASE ........ 5

A. Murray's Unanswered QWRs to the Servicers. ........ 6

B. Murray Files Suit Against the Servicers for Violating Their Obligations Under RESPA and Regulation X. ........ 8

SUMMARY OF ARGUMENT ........ 13

STANDARD OF REVIEW ........ 16

LEGAL ARGUMENT ........ 17

I. THE DISTRICT COURT ERRED IN INTERPRETING MURRAY'S COSTS INCURRED IN PREPARING AND MAILING THE QWRs AS "INCIDENTAL" AND INSUFFICIENT TO QUALIFY AS "ACTUAL DAMAGES" UNDER RESPA ........ 17

A. Actual Damages for a Servicer's Failure to Respond to a Borrower Information Request Under Section 2605(e) Include Concrete Out-of-Pocket Expenses, Like Postage and Preparation Fees, Even if De Minimus. ........ 19

B. Conflicting and Erroneous Interpretations of RESPA, and Misrepresentations of Existing Precedent, Have Resulted in Repeated Improper Claim Dismissals – Like Murray's – for Lack of Damages. ........ 29

II. THE DISTRICT COURT FURTHER ERRED IN CONCLUDING THAT THE SERVICERS' CHARGING OF ACCRUED INTEREST ON ERRONEOUS FEES ADDED TO MURRAY'S LOAN BALANCE, WHILE REFUSING TO PROVIDE A LOAN HISTORY OR OTHER INFORMATION SUBSTANTIATING THE INTEREST CHARGED WHEN REQUESTED, DID NOT CONSTITUTE ACTUAL DAMAGES PROXIMATELY CAUSED BY THE SERVICERS' RESPA VIOLATIONS. ....................36

CONCLUSION....................38

CERTIFICATION PURSUANT TO Fed. R. App. P. 32(a)(7)(B) and (C)....................39

# TABLE OF AUTHORITIES

***Cases*** **Page(s)**

*Becker v. PennyMac Loan Services, LLC*,
583 F. Supp. 3d 1090 (S.D. Ohio 2022)....................35

*Bocci v. Nationstar Mortg. LLC*,
No. 23-CV-1780, 2024 WL 3813756 (S.D.N.Y. June 28, 2024)....................17, 19

*Carilus v. United Wholesale Mortg., LLC*,
No. 24-CV-546 (JA)(PRL), 2025 WL 2917135 (M.D. Fla. Oct. 14, 2025)........35

*Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*,
620 F.3d 146 (2d Cir. 2010)....................16, 17

*Fowler v. Bank of Am., Corp.*,
747 F. App'x 666 (10th Cir. 2018)....................35

*Gorbaty v. Wells Fargo Bank, N.A.*,
No. 10-CV-3291 (NGG)(SMG), 2014 WL 4742509
(E.D.N.Y. Sept. 23, 2014)....................14, 19

*Gorham-Dimaggio v. Countrywide Home Loans, Inc.*,
No. 08-CV-00019, 2010 WL 883683 (N.D.N.Y. Mar. 8, 2010),
aff'd, 421 F. App'x 97 (2d Cir. 2011)....................18

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 118 (2d Cir. 2013)....................16

*Inorio v. Wells Fargo Bank, N.A.*,
522 F. Supp. 3d 417 (N.D. Ill. 2021)....................34

*Jackson v. Bank of Am., N.A.*,
No. 16-CV-787 (FPG), 2017 WL 5598856 (W.D.N.Y. Nov. 21, 2017).........15, 34

*Jackson v. Caliber Home Loans*,
No. 18-CV-4282 (NG)(CLP), 2019 WL 3426240 (E.D.N.Y. July 30, 2019)......14

*Kremenchutsky v. Citizens Bank N.A.*,
No. 24-CV-01615 (NCM)(LKE), 2025 WL 1249623
(E.D.N.Y. Apr. 30, 2025)....................18, 19

*Marais v. Chase Home Fin., LLC*,
24 F. Supp. 3d 712 (S.D. Ohio 2014)..........................................................*passim*

*Marais v. Chase Home Finance LLC*,
736 F.3d 711 (6th Cir. 2013) ........................................................................*passim*

*McCray v. Fed. Home Loan Mortg. Corp.*,
No. 13-CV-1518 (GLR), 2014 WL 293535 (D. Md. Jan. 24, 2014) ...................35

*Medical Marijuana, Inc. v. Horn*,
604 U.S. 593 (2025) ..........................................................................................20

*Mellentine v. Ameriquest Mortg. Co.*,
515 F. App'x 419 (6th Cir. 2013) .................................................................31, 33

*Midouin v. Downey Sav. & Loan Ass'n, F.A.*,
834 F. Supp. 2d 95 (E.D.N.Y. 2011) ..................................................................34

*Mourning v. Fam. Publications Serv., Inc.*,
411 U.S. 356 (1973) ..........................................................................................25

*Murray v. Newrez LLC*,
No. 24-CV-6160 (ARR), 2025 WL 1158090 (E.D.N.Y. Apr. 21, 2025).............17

*Paro Mgmt. Co. v. Willis of New Jersey, Inc.*,
No. 25-CV-872, 2025 WL 3085953 (2d Cir. Nov. 5, 2025) ................................17

*Ramirez v. Wells Fargo Bank, N.A.*,
No. 1:19-CV-05074 (CBA), 2021 WL 9564023 (E.D.N.Y. Mar. 24, 2021)........18

*Ratner v. Chem. Bank New York Tr. Co.*,
329 F. Supp. 270 (S.D.N.Y. 1971) ......................................................................26

*Renfroe v. Nationstar Mortg., LLC*,
822 F.3d 1241 (11th Cir. 2016) ...............................................................22, 26, 37

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012) ............................................................................................22

*Rosendale v. Mr. Cooper Grp. Inc.*,
No. 19-CV-9263 (NSR), 2024 WL 1484248 (S.D.N.Y. Apr. 5, 2024) ..........31, 33

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) .......... 26

*Sturgeon v. Frost*,
577 U.S. 424 (2016) .......... 21, 22

*Sullivan v. UBS AG*,
149 F.4th 206 (2d Cir. 2025) .......... 17

*Sutton v. CitiMortgage, Inc.*,
228 F. Supp. 3d 254 (S.D.N.Y. 2017) .......... *passim*

*Tanasi v. CitiMortgage, Inc.*,
257 F. Supp. 3d 232 (D. Conn. 2017) .......... 15, 34

***Statutes/Regulations/Miscellaneous***

12 C.F.R. § 1024.1 .......... 1

12 C.F.R. § 1024.35 .......... 17

12 C.F.R. § 1024.36 .......... 17

12 C.F.R. § 1024.36(a) .......... 18

12 U.S.C. § 2601 .......... 1

12 U.S.C. § 2602 .......... 21

12 U.S.C. § 2605(e) .......... *passim*

12 U.S.C. § 2605(e)(1) .......... 9, 17

12 U.S.C. § 2605(f) .......... 13, 19, 20, 24, 25

12 U.S.C. § 2605(f)(1) .......... 8, 12, 19, 20

12 U.S.C. § 2605(f)(3) .......... 12, 28

28 U.S.C. § 1291 .......... 2

Federal Rule of Civil Procedure 12(b)(6) .......... 2, 8, 12, 16

Plaintiff-Appellant Sherry Ann Murray ("Murray"), by and through her attorneys, Petroff Amshen LLP, respectfully submits the following brief in support of her appeal from the Opinion and Order of the United States District Court for the Eastern District of New York (Ross, J.), entered September 29, 2025 (A[1] 197-219), and the accompanying Clerk's Judgment entered on September 30, 2025 (A 220), both of which granted the motion to dismiss by Defendants-Appellees Newrez LLC d/b/a Shellpoint Mortgage Servicing ("Newrez") and PHH Mortgage Corporation d/b/a PHH Mortgage Services ("PHH") (collectively, the "Servicers"), without leave to amend.

## JURISDICTION

On September 24, 2024, Murray commenced the underlying action against the Servicers. (A 7-23). On November 22, 2024, and April 25, 2025, respectively, Murray filed a First Amended Complaint and Second Amended Complaint, both with leave of court. (A 70-92, 221-241). Subject matter jurisdiction in this matter is based on federal question pursuant to 28 U.S.C. § 1331, as Murray's claims primarily arise under federal law codified as the Real Estate Settlement Procedures Act (12 U.S.C. § 2601, *et seq.*) ("RESPA"), and its implementing regulation, Regulation X (12 C.F.R. § 1024.1, *et seq.*).

[1] References to the Appendix herein shall be denoted with the abbreviation "A".

By Opinion & Order entered September 29, 2025, the District Court granted the Servicers' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and dismissed Murray's Second Amended Complaint without leave to amend, disposing of all of Murray's claims. (A 535-543). The District Court subsequently entered a Clerk's Judgment memorializing this final order, which was entered on September 30, 2025. (A 544). Murray filed a timely notice of appeal on October 14, 2025. (A 545-546). Accordingly, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether a borrower's costs incurred in connection with preparing and mailing an information request under Section 2605(e) of RESPA and Section 1024.36 of Regulation X, by themselves, are sufficient to establish actual damages proximately caused by a servicer's RESPA violation, where the violation is the servicer's failure to provide any response at all to the borrower's information request.

2. Whether a borrower's costs incurred in connection with preparing and mailing a follow-up information request under Section 2605(e) of RESPA and Section 1024.36 of Regulation X, by themselves, are sufficient to establish actual damages proximately caused by a servicer's RESPA violation, where the violation is the servicer's failure to provide any response at all to the borrower's initial

information request, and the follow-up request would not have been necessary but for the servicer's failure to respond.

3. Whether accrued interest on an inflated loan balance due to erroneous fees a borrower is unable to remove from her account resulting from a servicer's failure to respond to her information requests, constitutes actual damages proximately caused by the servicer's RESPA violations.

## INTRODUCTION

This is an action to enforce the consumer protections codified under RESPA and its implementing regulation, Regulation X, with respect to a mortgage loan servicer's undisputed failure and refusal to respond to a borrower's multiple qualified written requests ("QWRs") pursuant to Section 2605(e), and Section 1024.36 of Regulation X, seeking information related to the servicing of her mortgage loan. Here, Murray sent the Servicers a total of four separate QWRs – two of which were follow-up requests – requesting account information regarding her mortgage loan, but the Servicers ignored each and every one. Finding herself without recourse after the Servicers' repeated failures to respond to her multiple QWRs, Murray sought the District Court's intervention by filing this lawsuit. Indeed, had the Servicers simply responded to her QWRs and provided the requested information or, at the very least, responded with a valid objection or any response at all to which

Murray could properly tailor a follow-up or new request, this action would not have been necessary in the first place. But that is not what happened.

By dismissing Murray's action with prejudice for purportedly failing to properly allege damages, despite expressly finding that the Servicers violated their RESPA obligations by failing to respond in any way to her QWRs, the District Court effectively wrote off Murray's legitimate and substantiated claims as a "victimless crime." In essence, the District Court rubber stamped the Servicers' statutory violations, and stripped Murray of the rights and consumer protections the Legislature intended in enacting RESPA in the first place.

This Court should reverse. To conclude otherwise would thwart the very purpose and legislative intent of Sections 2605(e) and (f), which, respectively, (i) requires loan servicers to disclose servicing-related information to borrowers and respond to relevant inquiries, and (ii) expressly grants such borrowers a private right of action to enforce any failure to comply with the requirements of Section 2605. Notably, concluding that the costs of preparing and mailing information requests that a servicer never responds to, despite being required to do so, are insufficient to establish "actual damages" to sustain a cause of action under RESPA means the legislation, and its intended consumer protections, have no teeth or purpose. This outcome only further incentivizes loan servicers to ignore their statutory obligations

and withhold critical account information from borrowers, knowing that doing so will result in no penalty or recourse whatsoever.

## STATEMENT OF THE CASE

Murray is the owner of real property situated in Kings County and located at 87 Blake Avenue, Brooklyn, New York 11212 (the "Property"). (A 222 ¶ 10). The Property is encumbered by a mortgage dated February 9, 2005, which secures repayment of a federally related mortgage loan given to Murray in the original principal amount of $440,325.00 (the "Mortgage"). (A 28-42). The Mortgage was recorded as a lien against the Property on March 2, 2005. *See id.* Murray subsequently executed a loan modification agreement with GMAC Mortgage, LLC ("GMAC") dated October 1, 2011, and recorded on November 14, 2011 (the "Modification"). (A 43-55). The Modification incorporated a $70,277.15 increase in the original principal owed on the loan, comprised of undisclosed and unidentified fees, interest, advances, and other charges and amounts (collectively, the "Capitalized Sums") that were added to Murray's loan balance. (A 44-45). However, the nature of these fees and other amounts included in the Capitalized Sums was not fully or properly disclosed to Murray or her attorneys in connection with the Modification, nor were they or any subsequent fees properly identified or disclosed to Murray when they were added to her account. (A 223-224).

GMAC was liquidated in bankruptcy shortly after the Modification. (A 225). Murray never received notice of any servicing transfers following the Modification with GMAC, leaving Murray with nowhere to turn for answers or information related to her Mortgage account or any purported amounts owed. (*Id.*). Accordingly, Murray engaged her attorneys to investigate and identify the servicer(s) of her Mortgage loan, and to obtain servicing-related account information on her behalf. (*Id.*).

### A. Murray's Unanswered QWRs to the Servicers.

Upon investigation, Murray's attorneys determined that PHH has been the servicer or subservicer of Murray's Mortgage loan account since in or about 2018, and Newrez has been the master servicer of the Mortgage since on or about April 4, 2019. (A 225-226). Murray's attorneys then sent a total of four (4) QWRs on her behalf to Newrez and PHH, seeking information related to the servicing of Murray's Mortgage loan account, including a complete loan transaction history and clarity regarding fees and Capitalized Sums added to Murray's loan balance. (A 56-69, 226-228). It is undisputed that Murray's QWRs were all "qualified written requests" for information under Section 2605 of RESPA and Section 1024.36 of Regulation X, and that neither Newrez nor PHH acknowledged or responded to any of the QWRs. *See* ECF 33 (A 536, 539).

Specifically, on May 6, 2024, Murray's attorneys prepared and mailed QWRs to Newrez and PHH, which included a specific and detailed list of requests for information relating to the servicing of Murray's loan, including (i) a complete payment history, (ii) a statement of any fees, advances, or charges added to the loan balance and not otherwise reflected in the payment history, and (iii) escrow account statements (collectively, the "First QWRs"). (A 56-63). The Servicers did not acknowledge receipt of Murray's First QWRs, or respond to them in any way. (A 227, 536, 539).

As a result, Murray was not only denied the protections and account information to which she is entitled under RESPA, but she had also expended fees and costs for the investigation, preparation, and mailing of QWRs that yielded no response or information whatsoever. (A 227, 233-235). Accordingly, on June 18, 2024, Murray was forced to expend unnecessary additional fees and costs, including postage, for her attorneys to prepare and mail a second set of QWRs to the Servicers (the "Second QWRs"). (A 64-69, 235-239). Like the First QWRs, the Second QWRs requested servicing-related account information, including loan and escrow transaction histories, and an itemization and explanation of fees and other charges added to the loan balance. (*Id.*). It is undisputed that the Servicers also failed to acknowledge or respond to the Second QWRs in any manner. (A 228, 536, 539).

The Servicers' failure to provide Murray with the requested account information, or any response to any of her QWRs, persists to date. (A 228, 497, 502).

### B. Murray Files Suit Against the Servicers for Violating Their Obligations Under RESPA and Regulation X.

After the Servicers' repeated failures to respond to her multiple QWRs, on September 24, 2024, Murray sought the District Court's intervention and commenced this lawsuit. (A 1-69). On November 22, 2024, Murray filed a First Amended Complaint (the "FAC"), with leave of court. (A 3-4, 70-92). On December 20, 2024, the Servicers filed a motion to dismiss the FAC (the "First MTD") pursuant to Rules 12(b)(1) and 12(b)(6). (A 93-196). On April 21, 2025, the District Court issued an Opinion & Order (the "Preliminary Dismissal Order") dismissing Murray's FAC without prejudice for "fail[ing] to allege damages under Section 2605(f)(1)," and "grant[ing] plaintiff leave to replead in order to correct these deficiencies." (A 197-219).

In the Preliminary Dismissal Order, although the District Court found not only that "Ms. Murray has sufficiently alleged for purposes of establishing standing that she suffered monetary injury from defendants' actions," but also that the Servicers "violated their obligations under RESPA" by failing to "acknowledge or respond in any way" to Murray's QWRs, the District Court erroneously concluded that Murray did not sufficiently allege that "she suffered damages that were proximately caused by defendants' *failure to timely respond* to her QWRs." (A 202-217) (emphasis in

original). In issuing the Preliminary Dismissal Order, the District Court's key findings included:

- "Ms. Murray has sufficiently alleged for purposes of establishing standing that she suffered monetary injury from defendants' actions," by alleging that "defendants added amounts 'to Plaintiff's loan balance [that] were excessive, illegal, and/or improper'" and "Defendants continue to improperly manage Ms. Murray's loan balance."

- Although "defendants argue that they were not obligated to respond to Ms. Murray's QWRs because they were 'overbroad and unduly burdensome[,]' . . . [b]ased on Ms. Murray's allegations that defendants did not acknowledge or respond in any way, I find that defendants violated their obligations under RESPA."

- "I find that defendants' inaction violated RESPA and Regulation X no matter what category or categories that Ms. Murray's four QWRs fall under. . . . [because] defendants did not acknowledge or respond to any of Ms. Murray's letters."

- "[E]ven if Ms. Murray's QWRs fell under one of the exceptions in Regulation X, defendants were still required to provide a written response, which they apparently failed to do."

- Defendants have an "obligation as Ms. Murray's mortgage servicers to provide her with the procedures and account information that she is entitled to under RESPA."

- "A liberal reading of the Amended Complaint does not foreclose the possibility that Ms. Murray may have a valid RESPA claim. To bring a valid RESPA claim that will survive a motion to dismiss, Ms. Murray must allege additional facts that (1) she suffered damages that were proximately caused by defendants' *failure to timely respond* to her QWRs. Furthermore, Ms. Murray must allege facts illustrating that the attached letters can meet statutory requirements under 12 U.S.C. § 2605(e)(1)(B), such that her unanswered requests and corresponding damages are related to the ongoing servicing of her loan, and not the modification of her loan in 2011."

(A 197-219) (internal citations omitted) (emphasis in original).

Thereafter, on April 25, 2025, Murray filed a Second Amended Complaint (the "SAC") addressing the deficiencies outlined in the Court's Preliminary Dismissal Order. (A 221-241). In particular, Murray alleged:

- The Servicers' "failure to acknowledge or respond to Plaintiff's multiple qualified written requests for information related to her mortgage loan account . . . prevented Plaintiff from correcting errors to her account, including removing improper fees added to the loan balance that continue to accrue interest on a *per diem* basis."

- The Servicers "continued adding excessive, improper, and/or illegal Capitalized Sums to Plaintiff's loan balance, which amounts continue to accrue interest on an ongoing basis. Although the terms of the Mortgage permit the 'Lender' to take action to protect its interest in the Property . . . and to seek reimbursement from the borrower for amounts expended to do so, Plaintiff must be given notice of any request for payment of these amounts. . . . Plaintiff did not receive notice of a request for payment of any amounts purportedly expended under Paragraph 9 of the Mortgage, including any Capitalized Sums" added to her loan balance.

- Murray sent the First QWRs to the Servicers "to obtain information related to the servicing of her Mortgage loan account, including clarity regarding fees and other amounts added to her loan balance."

- "As a result of [the Servicers'] failure to acknowledge or respond to the [First QWRs], and still in the dark regarding crucial information related to her loan account, Plaintiff was forced to incur additional attorneys' fees and costs, including postage, for the preparation and mailing of [the Second QWRs]."

- "Defendants . . . did not acknowledge or respond to any of Plaintiff's QWRs at all."

- "As a result of Defendants' failure to acknowledge or respond to the First QWRs in violation of RESPA and Regulation X, leaving Plaintiff in the dark regarding crucial information related to her loan account, Plaintiff was forced to incur attorneys' fees and costs, including postage, for the preparation and mailing of a *second* set of QWRs. But for Defendants' complete failure to respond to the First QWRs or provide Plaintiff with the requested information, a second set of QWRs would not have been necessary."

- "Defendants' refusal to investigate Plaintiff's account upon receipt of the QWRs, to identify and correct errors as required (or to respond and provide so much as a loan transaction history) means that, at the very least, *per diem* interest on the increased loan balance as a result of improper fees (including at least $70,277.15 in Capitalized Sums added to the loan) has continued to accrue on Plaintiff's account since the date of Defendants' failure to respond to the First QWRs, causing harm on an ongoing basis."

- "As a result of Defendants' foregoing actions in violation of their statutory obligations under RESPA, Plaintiff has suffered actual damages and incurred an ascertainable loss. These actual damages include, but are not limited to, increased debt and financial burden resulting from improperly imposed fees, interest, and other charges added to her loan balance, continually accruing interest on any such improper Capitalized Sums, and payment of attorneys' fees and other professional retainer costs."

- "In particular, Plaintiff has incurred quantifiable actual damages including *per diem* interest on improper Capitalized Sums that were not removed from the loan balance following Defendants' failure to respond to the First QWRs, and the costs of preparing and mailing the Second QWRs, which would not have been necessary but for Defendants' failure to respond to the First QWRs."

- "Given Defendants' complete failure to acknowledge or respond to any of Plaintiff's QWRs in any way, Plaintiff's actual damages proximately caused by Defendants' RESPA violations also arguably include the costs of preparing and mailing the First QWRs, even though they were incurred prior to Defendants' failure to respond."

- "Plaintiff is entitled to recover actual damages pursuant to 12 U.S.C. § 2605(f)(1), which include (i) *per diem* interest of $8.18 on the improper Capitalized Sums totaling at least $70,277.15, which Plaintiff has been unable to address or remove from her loan balance due to Defendants' failure to respond to her QWRs, running from the date of each Defendant's respective failure to respond to each of the First QWRs; (ii) costs of preparing and mailing the Second QWRs, including postage totaling $3.20 and attorneys' fees totaling $225, after Defendants failed to respond to the First QWRs; and (iii) costs of preparing and mailing the First QWRs, which Defendants also never responded to, including postage totaling $3.20 and attorneys' fees totaling $225; along with attorneys' fees and costs incurred in connection with bringing this action pursuant to 12 U.S.C. § 2605(f)(3)."

(A 221-241).

On June 25, 2025, the Servicers moved to dismiss the SAC (the "Second MTD"). (A 243-534). By Opinion & Order entered September 29, 2025, the District Court granted the Servicers' Second MTD pursuant to Fed. R. Civ. P. 12(b)(6), and dismissed Murray's SAC without leave to amend (the "Final Dismissal Order"), again erroneously finding that "Murray fail[ed] to plead that defendants' failures to respond [to the QWRs] caused actual damages." (A 535-543). The District Court subsequently entered a Clerk's Judgment memorializing this final order, which was entered on September 30, 2025 (the "Judgment"). (A 544).

In issuing the Final Dismissal Order, the District Court first erroneously conflated Murray's information requests seeking a loan transaction history and other servicing related account information with an attempt to challenge the Modification – an allegation Murray has expressly, and repeatedly, denied. (A 541-542). As Murray noted in opposition to the Second MTD, (i) the Servicers "acknowledge[e]

the QWRs were information requests that did not include 'any reference to the Modification or any notification as to a possible error regarding the Modification,'" and (ii) "Plaintiff does not seek to challenge or invalidate the Modification; all she wants is the transaction history and other account information to which she is entitled . . . ." (A 255-256, 498).

The District Court further conflated Murray's costs incurred in preparing and mailing the QWRs (including the Second QWRs, which would not have been necessary but for the Servicers' complete failure to respond in any way to the First QWRs) with incidental costs of litigation, finding: "Ms. Murray fails to plead that the postage and attorney's fees she expended on mailing the QWRs and pursuing this litigation constitute actual damages. The costs of a RESPA action do not qualify as actual damages." (A 542) (internal citations omitted).

On October 14, 2025, Murray filed a timely notice of appeal. (A 545-546).

## SUMMARY OF ARGUMENT

The District Court erred in finding that Murray failed to plead actual damages under RESPA caused by the Servicers' deliberate, repeated, and ongoing failures to respond to her QWRs seeking information related to the servicing of her mortgage loan. Although RESPA explicitly gives a borrower a private right of action to enforce violations of Section 2605 (*see* 12 U.S.C. § 2605(f)), the current body of case law interpreting it – especially where a servicer simply refuses to respond to a

borrower's legitimate information requests – effectively renders this vital consumer protection statute meaningless, as it thwarts RESPA's legislative intent to "require[] loan servicers to disclose pertinent information to borrowers, attempt to correct errors in servicing, and respond to relevant questions from borrowers." *Jackson v. Caliber Home Loans*, No. 18-CV-4282 (NG)(CLP), 2019 WL 3426240, at *1 (E.D.N.Y. July 30, 2019).

In particular, the courts have interpreted the "actual damages" requirement of Section 2605(f) to mean a plaintiff must "allege injury and resulting damages that are proximately caused by the loan servicer's failure to adhere to its obligations under § 2605—*i.e.*, the timing and form of [defendants'] responses to Plaintiff's QWRs." *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-CV-3291 (NGG)(SMG), 2014 WL 4742509, at *5 (E.D.N.Y. Sept. 23, 2014). This requirement, however, has been misinterpreted and eroded to the point where loan servicers are actually incentivized to ignore the response requirements of Section 2605(e), as the courts have repeatedly declined to enforce any civil penalty for violation of the statute, despite RESPA expressly providing for such penalty. Indeed, that is precisely what happened here because of the current erroneous interpretations of RESPA that persist in this Circuit, which have made it an exercise in futility to sustain a cause of action under Section 2605(e).

Based on the current body of law interpreting the statute, the only "actual damages" a borrower could legitimately link to the actual RESPA violation in the case of a servicer's total failure to respond would be the costs associated with preparing and mailing the requests. But many New York District Courts have rejected this claim of damages as "incidental," based solely on the holding of a single Southern District case – *Sutton v. CitiMortgage, Inc.*, 228 F. Supp. 3d 254 (S.D.N.Y. 2017). While some courts in the Second Circuit have recognized that costs incurred after an incomplete or insufficient response are recoverable under RESPA, or even that such damages on an initial request alone are sufficient in certain cases, the District Court here erroneously relied on *Sutton* to interpret Murray's damages as "incidental". *See Jackson*, 2019 WL 3426240, at *8 ("Costs incurred after an incomplete or insufficient response may be recoverable under RESPA . . . ."); *Tanasi v. CitiMortgage, Inc.*, 257 F. Supp. 3d 232, 271 (D. Conn. 2017) (declining to dismiss RESPA claims asserting "damages stemming from the preparation of later requests, or of notices of error that [plaintiffs] would not have needed to prepare but for [servicer's] alleged violations," finding that "[c]osts incurred after an incomplete or insufficient response are recoverable under RESPA"); *Jackson v. Bank of Am., N.A.*, No. 16-CV-787 (FPG), 2017 WL 5598856, at *6 (W.D.N.Y. Nov. 21, 2017) ("In addition to late fees, Plaintiffs allege they incurred administrative costs 'such as postage, photocopying, scanning, and travel expenses that they would not have

incurred if' Defendant had complied with RESPA, as well as 'lost time and inconvenience' and a 'ruined credit score.' Many courts have held that these sorts of damages are recoverable under RESPA." (internal citation omitted)).

Unfortunately, in this case, the Servicers succeeded in distracting the District Court from the real issue of their staunch refusal to even feign compliance with the statute, and to incorrectly conclude that Murray had not sufficiently alleged actual damages stemming from their violations. If costs associated with a follow-up request after an incomplete or insufficient response are recoverable as actual damages under RESPA, then certainly the costs associated with a request for which there was no response should likewise be recoverable. At the very least, allegations of fact regarding the costs incurred in connection with such futile information requests, and a servicer's associated statutory violations causing the expenditure of unnecessary and additional costs, as here, should be more than sufficient to survive a Rule 12 motion to dismiss. Accordingly, this Court should reverse.

## STANDARD OF REVIEW

The Court "review[s] *de novo* a district court's dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), 'construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.'" *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 122 (2d Cir. 2013) (quoting *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620

F.3d 146, 150 (2d Cir. 2010)); *see also Sullivan v. UBS AG*, 149 F.4th 206, 217 (2d Cir. 2025) ("We . . . review *de novo* a district court's dismissal for failure to state a claim."); *Paro Mgmt. Co. v. Willis of New Jersey, Inc.*, No. 25-CV-872, 2025 WL 3085953, at *1 (2d Cir. Nov. 5, 2025).

## LEGAL ARGUMENT

### I. THE DISTRICT COURT ERRED IN INTERPRETING MURRAY'S COSTS INCURRED IN PREPARING AND MAILING THE QWRs AS "INCIDENTAL" AND INSUFFICIENT TO QUALIFY AS "ACTUAL DAMAGES" UNDER RESPA.

"Section 2605(e) of RESPA and its implementing regulations allow borrowers to submit QWRs to the party responsible for servicing their mortgage loan requesting information regarding loan-servicing matters or providing notice that their account is in error." *Bocci v. Nationstar Mortg. LLC*, No. 23-CV-1780, 2024 WL 3813756, at *6 (S.D.N.Y. June 28, 2024) (citing 12 U.S.C. § 2605(e)(1), *report and recommendation adopted*, 2024 WL 4326932 (S.D.N.Y. Sept. 27, 2024)); 12 C.F.R. §§ 1024.35-1024.36). "Upon receiving a QWR, servicers of federally related mortgage loans must conduct an investigation, make appropriate corrections in the account of the borrower, and provide a written explanation about why the servicer believes the account of the borrower is correct or why the information requested is unavailable." *Murray v. Newrez LLC*, No. 24-CV-6160 (ARR), 2025 WL 1158090, at *4 (E.D.N.Y. Apr. 21, 2025). For purposes of Regulation X, "[a] qualified written request that requests information relating to the servicing of the mortgage loan is a

request for information for purposes of this section [1024.36], and a servicer must comply with all requirements applicable to a request for information with respect to such qualified written request." 12 C.F.R. § 1024.36(a).

As the District Court acknowledged when deciding Defendants' First MTD:

> Borrowers have a private right of action to recover "any actual damages" caused by a servicer's failure to comply with any provision of Section 2605. This private right of action also permits recovery for damages caused by a servicer's violation of Regulation X, which is Section 2605's implementing regulation as established by the Consumer Financial Protection Bureau (CFPB).

*Murray*, 2025 WL 1158090, at *5 (internal citation omitted) (citing 12 U.S.C. § 2605(f)); *see also Ramirez v. Wells Fargo Bank, N.A.*, No. 1:19-CV-05074 (CBA), 2021 WL 9564023, at *6 (E.D.N.Y. Mar. 24, 2021) (finding that violations of Section 2605 and CFPB regulations "issued . . . pursuant to the Bureau's authority under section 6 of RESPA . . . are subject to a private right of action pursuant to section 6(f) of RESPA." (quoting *Mortgage Servicing Rules*, 78 Fed. Reg. at 10823)).

"To allege a RESPA violation [related to a QWR], a plaintiff must allege that he or she sent a letter that qualified as a QWR and the loan servicer did not appropriately or timely respond." *Kremenchutsky v. Citizens Bank N.A.*, No. 24-CV-01615 (NCM)(LKE), 2025 WL 1249623, at *5 (E.D.N.Y. Apr. 30, 2025) (citing *Gorham-Dimaggio v. Countrywide Home Loans, Inc.*, No. 08-CV-00019, 2010 WL 883683, at *3 (N.D.N.Y. Mar. 8, 2010), *aff'd*, 421 F. App'x 97 (2d Cir. 2011)).

RESPA permits a borrower to recover "any actual damages to the borrower as a result of the failure," and statutory damages "in the case of a pattern or practice of noncompliance with the requirements of [Section 2605]." 12 U.S.C. § 2605(f)(1). Cases in this Circuit currently interpreting the statute note that "[t]o state a claim under RESPA, a plaintiff must [1] allege that the defendant failed to comply with specific RESPA provisions and [2] identify damages that [he or] she sustained as a result of the defendant's alleged RESPA violations." *Kremenchutsky*, 2025 WL 1249623, at *7 (emphasis added) (quoting *Bocci*, 2024 WL 3813756, at *8). In other words, "[i]n order to recover actual damages, a plaintiff must allege injury and resulting damages that are proximately caused by the loan servicer's failure to adhere to its obligations under § 2605—*i.e.*, the timing and form of [defendants'] responses to Plaintiff's QWRs." *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-CV-3291 (NGG)(SMG), 2014 WL 4742509, at *5 (E.D.N.Y. Sept. 23, 2014).

Based on these and similar holdings regarding the "actual damages" requirement of Section 2605(f), the District Court erred in concluding that Murray's damages as alleged were insufficient to sustain a cause of action under RESPA.

### A. Actual Damages for a Servicer's Failure to Respond to a Borrower Information Request Under Section 2605(e) Include Concrete Out-of-Pocket Expenses, Like Postage and Preparation Fees, Even if *De Minimus*.

RESPA's statutory language does not expressly preclude *de minimus*, or even so-called "incidental" costs, as actual damages stemming from a servicer's violation

of Section 2605(e) in failing to respond to a borrower's information request. *See* 12 U.S.C. § 2605(f)(1). Murray's SAC sufficiently alleges specific and concrete damages proximately caused by the Servicers' failure to respond to her QWRs, in the form of "costs of preparing and mailing the First QWRs, even though they were incurred prior to Defendants' failure to respond . . . including postage totaling $3.20 and attorneys' fees totaling $225," and "costs of preparing and mailing the Second QWRs, which would not have been necessary but for Defendants' failure to respond to the First QWRs . . . including postage totaling $3.20 and attorneys' fees totaling $225." (A 238-239). Indeed, eliminating the ability to claim such out-of-pocket expenses as actual damages would strip Sections 2605(e) and 2605(f) of their teeth, and effectively render RESPA's purported consumer protections meaningless.

The District Court's dismissal was predicated on an erroneous interpretation that concrete out-of-pocket expenses – specifically postage, and investigation and preparation fees for the QWRs themselves, are non-recoverable "incidental costs" that cannot qualify as actual damages. Although the District Court relied on similarly erroneous holdings of other cases in this Circuit, RESPA's actual text provides no basis for this distinction. And following the Supreme Court's recent decision in *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025), such extra-textual limitations on remedial statutes are no longer viable. *Horn* instructs that courts must apply the ordinary meaning of statutory terms regarding injury and damages, thereby rejecting

such policy-based gatekeeping that seeks to narrow remedies beyond the text enacted by Congress. In so doing, the Supreme Court established a straightforward standard that controls the interpretation of remedial statutes like RESPA, using a strict interpretation approach, rather than the extrinsic and flawed analysis the District Court employed here. *See id.*; *see also Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 728 (S.D. Ohio 2014) ("[T]he Court notes that, '[a]s a remedial statute, RESPA is construed broadly to effectuate its purposes.'" (citations omitted)) ("*Marais II*").

As the Supreme Court explained, statutory interpretation should be guided by the ordinary meaning of the language enacted by Congress. For example, while elementary, the ordinary meaning of "injure" is "to cause harm or damage to" or "to hurt," and "damages" are defined as "monetary redress" or the "amount that makes [the plaintiff] whole." *Horn*, 604 U.S. at 601, 604; *see also Marais II*, 24 F. Supp. 3d at 728 ("The term 'actual damages' is not defined within RESPA. Thus, the Court turns to the common meaning, '[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses.'" (internal citations omitted) (citing 12 U.S.C. § 2602; Black's Law Dictionary (9th ed. 2009))). Applying this logic to RESPA and the text of Section 2605, the District Court's exclusion of postage and preparation costs as actual damages for a QWR that was never responded to fails the "textualist" test. *See Sturgeon v. Frost*, 577 U.S. 424,

438 (2016) (rejecting the Ninth Circuit's interpretation of a statute, finding it "may be plausible in the abstract, but it is ultimately inconsistent with both the text and context of the statute as a whole," and noting that "[s]tatutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'") (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)).

Murray expended funds for preparation and mailing of the First QWRs which, as RESPA requires, should have resulted in a response and the information Murray requested. (A 56-63, 238-239); *see* 12 U.S.C. § 2605(e), 12 C.F.R. § 1024.36. Instead, the Servicers ignored the First QWRs and provided no information or response whatsoever, rendering Murray's expenditure of the funds futile. Once the Servicers failed to respond in any way to Murray's First QWRs, her out-of-pocket costs for the preparation and mailing of these requests could no longer be considered "incidental," as such expenses associated with the requests would only be considered ordinary or expected if they resulted in the required response. *See Marais II*, 24 F. Supp. 3d at 727-728. In other words, Murray's costs associated with the First QWRs are actual damages because if the Servicers "had heeded [their] statutory duties," Murray would have received a response and the information she requested. *See Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1246 (11th Cir. 2016) (finding

that RESPA claims and associated damages apply to past errors and rejecting a "cramped reading of RESPA," which "would mean gutting RESPA" and rendering it "meaningless because it could always be circumvented").

Murray then had to expend additional, repetitive funds for the same purpose – to prepare and send the Second QWRs when the Servicers failed to respond to her initial information requests – which would not have been necessary but for the initial failure to respond. Therefore, under the ordinary meaning doctrine, Murray was "harmed" or "hurt" financially as a direct result of the Servicers' failure to respond to any of her QWRs, and reimbursement of these specific out-of-pocket costs constitutes "monetary redress" required to make her whole. *See Marais II*, 24 F. Supp. 3d at 728.

The District Court acknowledged these costs were incurred, but dismissed them as incidental. (A 542). This outcome mimics the error of the *Horn* defendant, who admitted the plaintiff lost wages, but argued the type of loss was excluded from the categories of allowable damages. *See Horn*, 604 U.S. at 599. *Horn* clarifies that statutory injury requirements operate "with respect to the kinds of harm for which the plaintiff can recover, not the cause of the harm." *Horn*, 604 U.S. at 601. Since RESPA protects borrowers against economic loss caused by servicer non-compliance, and money spent on postage is an economic loss, it is a recoverable kind of harm. The statute contains no *de minimis* exception, nor does it exclude harms

associated with costs incurred to investigate a violation. *See* 12 U.S.C. §§ 2605(e), 2605(f).

Although the District Court here referenced the Southern District's holding in *Sutton* to categorize Murray's damages as "incidental" and not constituting "actual damages," the *Sutton* court never actually defined or interpreted the terms "incidental" or "actual damages." Rather, the Southern District simply adopted the Sutton plaintiff's allegation regarding "incidental costs related to the sending of correspondence to Citi" as a category of damages alleged in her amended complaint, without further analysis or discussion. *See Sutton*, 228 F. Supp. 3d at 274-275. Notably, the Supreme Court explicitly warned against "making a term-of-art argument without the term of art." *Horn*, 604 U.S. at 603. The *Horn* defendant tried to redefine "injury" to mean "invasion of a legal right" (a business tort), excluding personal injury consequences. The Court refused this erroneous interpretation, noting that where a statute uses ordinary words like "injured" (or here, "damages"), courts must apply their ordinary meaning. *Id.*

In applying the *Horn* analysis to this case, just as RICO does not contain a "business torts only" limitation, RESPA does not contain a "non-administrative costs only" limitation. "Actual damages" is not a term of art that implicitly excludes postage, but rather, is a broad remedial term meant to cover any real pecuniary loss. By categorizing and dismissing Murray's postage and preparation expenditures as

"incidental," the District Court effectively inserted its own exception into the statutory language of Section 2605(f). This is precisely what the *Horn* analysis prohibits. *See Mourning v. Fam. Publications Serv., Inc.*, 411 U.S. 356, 376 (1973) (rejecting, in the context of the Truth in Lending Act, "respondent's argument that [section] 130 does not allow imposition of a civil penalty in cases where no finance charge is involved but where a regulation requiring disclosure has been violated" because "the objective sought in delegating rule making authority to an agency is to relieve Congress of the impossible burden of drafting a code explicitly covering every conceivable future problem. . . . In light of the emphasis Congress placed on agency rule making and on private and administrative enforcement of the Act, we cannot conclude that Congress intended those who failed to comply with regulations to be subject to no penalty.").

The foundation for this bar is a policy preference, not a statutory directive. The *Sutton* court justified the exclusion of "incidental" costs by arguing that allowing them to qualify as damages "would transform virtually all unsatisfactory borrower inquiries into RESPA lawsuits." *Sutton*, 228 F. Supp. 3d at 274. In *Horn*, the defendant similarly warned that a broad reading of the statute would lead to an "undue proliferation" of lawsuits. *Horn*, 604 U.S. at 613. The Supreme Court's response was unequivocal: "If the statute allows the undue proliferation of . . . suits,

the 'correction must lie with Congress.'" *Id.* (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).

The District Court here engaged in the exact judicial gatekeeping the *Horn* analysis forbids. By narrowing the definition of redressable "damages," it sought to shield the federal courts from dealing with a proliferation of mere "unsatisfactory borrower inquiries." But Congress drafted RESPA to encourage and expressly enable borrower inquiries, and to penalize servicers who ignore them. It could have set a monetary floor for damages or excluded administrative costs, but it did not. Given RESPA's well-documented legislative intent to provide consumer protections and open access to information, and without such exclusionary language in the text of the statute, the District Court lacks the authority to close the courthouse doors to Murray simply because her damages are small, or because it fears a proliferation of similar suits. *See Renfroe*, 822 F.3d at 1244 ("Guiding this analysis is the principle that RESPA, as a remedial consumer-protection statute, should be construed liberally in order to best serve Congress's intent."); *see also Ratner v. Chem. Bank New York Tr. Co.*, 329 F. Supp. 270, 280-281 (S.D.N.Y. 1971) (noting in the context of similar, parallel consumer protection legislation – the Truth in Lending Act – that "[t]he scheme of the statute, as both sides agree, is to create a species of 'private attorney general' to participate prominently in enforcement. The language should be construed liberally in light of its broadly remedial purpose. . . . Congress made clear

its broader scheme, and broader system of reimbursement, for private enforcement.”).

Finally, the District Court’s “incidental” classification of Murray’s damages fails to account for the “transmogrification” of costs recognized by the Southern District of Ohio in *Marais II*, after the Sixth Circuit reversed the District Court’s prior decision in *Marais v. Chase Home Finance LLC*, 736 F.3d 711 (6th Cir. 2013) (“*Marais I*”). Specifically, in *Marais I*, the Sixth Circuit noted:

> [T]he district court’s determination that costs Marais incurred associated with preparing her QWR did not constitute actual damages, did not take into account Marais’s argument that those costs were for naught due to Chase’s deficient response, *i.e.*, her QWR expenses became actual damages when Chase ignored its statutory duties to adequately respond. The district [court] should consider this argument on remand.

*Marais I*, 736 F.3d at 721 (internal citation omitted).

On remand, the District Court noted, “[t]hat the deleterious consequences of the delict act are prerequisites to the claim, is not a good reason to exclude them as damages,” and held that expenses for postage and certified mailing of a QWR, although incurred and paid prior to the servicer’s deficient response as “transactions costs incident to . . . obtaining information about [Marais’] loan,” “metamorphosed into damages” “when Chase failed to do that which it was obligated to do.” *Marais II*, 24 F. Supp. 3d at 728. This is consistent with *Horn*, which emphasizes the actual injury over the timing of the antecedent event. *See Horn*, 604 U.S. at 601 (rejecting

the "antecedent-personal-injury bar"). In *Marais II*, the District Court held that costs incurred to send a QWR – normally a sunk cost – metamorphosize into actual damages when the servicer fails to respond, because the servicer's silence renders the expenditure a total loss. *Marais II*, 24 F. Supp. 3d at 728; *see also Marais I*, 736 F.3d at 721.

Murray spent money to buy a response from Newrez and PHH. When the Servicers violated RESPA by failing to provide the requested information, they destroyed the value of that expenditure. Under *Horn* and the plain language of RESPA, that is a concrete "harm" to Murray. It is not "incidental" to the litigation; it is the injury that the litigation seeks to redress. Thus, the District Court erroneously interpreted these damages as being the "costs of a RESPA action" and "pursuing litigation." (A 542). These costs are completely separate from the litigation, which the Servicers could have avoided by simply fulfilling their statutory obligations and providing Murray with her account information. Indeed, given that RESPA separately provides for successful litigants to recover attorneys' fees and costs of suit in addition to actual damages, such fees and costs are not part of the "actual damages" alleged in Murray's SAC. *See* 12 U.S.C. § 2605(f)(3).

### B. Conflicting and Erroneous Interpretations of RESPA, and Misrepresentations of Existing Precedent, Have Resulted in Repeated Improper Claim Dismissals – Like Murray's – for Lack of Damages.

Adding to the confusion and proliferation of RESPA dismissals are the conflicting interpretations of the statute around the country and even within the Second Circuit. Most, if not all, of the New York District Court cases holding that the costs of preparing and sending a QWR are "incidental" and do not qualify as actual damages, rely on outright misstatements and misinterpretations of holdings in other cases. These cases and erroneous interpretations are then incorporated into additional decisions and unreviewed string cites, resulting in a game of legal "telephone" where the flawed rulings are simply passed on and incorporated over and over, with no actual reference or connection to their true origins.

The most egregious and frequently-cited example of this is the Southern District of NY's decision in *Sutton* – the same case upon which the District Court here improperly relied. The *Sutton* court erroneously quoted language from *Marais II* as support for its conclusion that "[t]o permit a cause of action based on incidental costs would transform virtually all unsatisfactory borrower inquiries into RESPA lawsuits, and, in so doing, would subvert the very reason for the damages requirement in the first place." *See Sutton*, 228 F. Supp. 3d at 274-275. Specifically, the *Sutton* court parenthetically quoted language from *Marais II* that stated – in the <u>past tense</u> – that "courts in this circuit and district have <u>previously</u> found that the

costs of preparing and sending a QWR, as well as costs of filing suit to enforce RESPA, do not satisfy the actual damages requirement." *See id.* (quoting *Marais II*, 24 F. Supp. 3d at 727) (emphasis added). *Marais II* continued, noting that "[t]racing such decisions to their roots, the rationale was that finding otherwise would mean that every RESPA suit would have damages built-in 'because every mortgagor who sent a QWR would suffer actual damages simply by sending the request and regardless of whether the loan servicer's response was deficient.'" *Marais II*, 24 F. Supp. 3d at 727 (emphasis added).

In fact, the foregoing language from *Marais II* upon which the *Sutton* court relied is the exact language *Marais II* reversed in the very next paragraph, stating:

> However, the Sixth Circuit Opinion, issued regarding an earlier decision in this case, implies a new course for the courts in this circuit. In reversing this Court, the Sixth Circuit, commented:
>
> > In addition [to the other reasons Marais competently alleged damages], the district court's determination that costs Marais incurred associated with preparing her QWR did not constitute actual damages, did not take into account Marais's argument that those costs were for naught due to Chase's deficient response, i.e., her QWR expenses became actual damages when Chase ignored its statutory duties to adequately respond. The district could should [sic] consider this argument on remand.
>
> The Circuit, in ruling for Marais, would not likely have suggested consideration of this argument if it thought our prior precedent clearly settled the issue against Marais. Since our prior precedent, reviewed above, would, if followed, settle the issue against Marais, the Court takes the Circuit's statement as a directive to reconsider the analysis employed in previous district decisions before the Circuit does it for us.

*Marais II*, 24 F. Supp. 3d at 727 (emphasis added) (internal citations omitted) (citing *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 424-425 (6th Cir. 2013) for the proposition of "showing the softening stance on qualifying damages by holding that a plaintiff who alleged amorphous 'damages in an amount not yet ascertained, to be proven at trial' could satisfy the actual damages element").

Another, more recent example is the Southern District's decision in *Rosendale v. Mr. Cooper Grp. Inc.*, No. 19-CV-9263 (NSR), 2024 WL 1484248 (S.D.N.Y. Apr. 5, 2024):

> Turning to Plaintiff's allegations regarding his "lost time an[d] expended printing and postage [expenses,]," Plaintiff's claim similarly fails. As another court has held in this District, "[t]o permit a cause of action based on incidental costs would transform virtually all unsatisfactory borrower inquiries into RESPA lawsuits, and, in so doing so, would subvert the very reason for the damages requirement in the first place." *Sutton v. CitiMortgage, Inc.*, 228 F. Supp.3d 254, 274-75 (S.D.N.Y. 2017) <u>*Cf. Marais v. Chase Home Fin., LLC*, 24 F. Supp.3d 712, 727 (S.D. Ohio 2014) (noting that courts in the Southern District of Ohio routinely hold that the costs of preparing and sending a QWR do not satisfy the actual damages requirement.))</u>.

*Rosendale*, 2024 WL 1484248, at *10 (emphasis added). Notably, in *Rosendale*, the Southern District improperly cites to *Marais II* as support for the paraphrased proposition that "courts in the Southern District of Ohio <u>routinely hold</u> that the costs of preparing and sending a QWR do not satisfy the actual damages requirement." *See Rosendale*, 2024 WL 1484248, at *10 (emphasis added). This is actually an outright misrepresentation of *Marais II* and the current position of courts in the Sixth

Circuit. In fact, after being reversed by the Sixth Circuit in *Marais I*, the Southern District of Ohio noted:

> [C]ourts in this circuit and district have previously found that the costs of preparing and sending a QWR, as well as costs of filing suit to enforce RESPA, do not satisfy the actual damages requirement. Tracing such decisions to their roots, the rationale was that finding otherwise would mean that every RESPA suit would have damages built-in "because every mortgagor who sent a QWR would suffer actual damages simply by sending the request and regardless of whether the loan servicer's response was deficient." . . . However, the Sixth Circuit Opinion, issued regarding an earlier decision in this case, implies a new course for the courts in this circuit. . . . Since our prior precedent, reviewed above, would, if followed, settle the issue against Marais, the Court takes the Circuit's statement as a directive to reconsider the analysis employed in previous district decisions before the Circuit does it for us.
>
> This Court still recognizes that there is some appeal in the argument that any RESPA violation will have damages built-in if actual damages are construed broadly enough to encompass costs associated with the QWR and suit to enforce RESPA. But, upon reflection, such arguments prove too much. Every civil case, after all, has some damages built-in. Recklessly discharging a gun in the air would satisfy most elements of a tort. But the claim is not complete until the bullet turns Earthward and strikes something—causing damages. Damages are no more built-in to a RESPA suit than they are any tort, or any other cause of action that cannot and will not be brought without damages. That the deleterious consequences of the delict act are prerequisites to the claim, is not a good reason to exclude them as damages.
>
> The Court also recognizes that there is great merit in the general proposition that damages are consequences that flow from the wrongful action and must, therefore, succeed the wrongful act in time. A headache that began hours before a car crash cannot be the result of the crash or considered as damages from it. However, in some cases, a wrongful act can cause damages retroactively. If a fellow pays a painter to paint his house, the payment is a cost. If the painter in fact, paints the house, the cost remains a cost. If the painter does not paint the house

> and instead, absconds with the money, the cost (though already incurred and paid) transmogrifies into damages.
>
> The term "actual damages" is not defined within RESPA. Thus, the Court turns to the common meaning, "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." In addition, the Court notes that, "[a]s a remedial statute, RESPA is construed broadly to effectuate its purposes." Hence, with these considerations in mind, and looking at the generous treatment given to damages in *Mellentine*, and *Houston*, as well as by the Sixth Circuit in this case, the Court construes actual damages as encompassing all provable injuries that are the result of Chase' response to receiving the QWR. Or, to put a finer point on it, <u>all expenses, costs, fees, and injuries fairly attributable to Chase's failure to respond appropriately to the QWR, even if incurred before the failure to respond, are included</u>. . . .
>
> <u>Marais submits receipts showing postage for certified mailing of the QWR. Though she incurred these expenses and paid them prior to Chase's deficient response, these are damages. That is, when they were incurred they were merely the transaction costs incident to correcting Marais' account or obtaining information about her loan. However, when Chase failed to do that which it was obligated to do, these costs metamorphosed into damages</u>. Thus, it was Chase's failure that caused the metamorphosis; thus, it was Chase that caused the damages; hence, these damages, née costs, are "actual damages to the borrower as a result of [Chase's] failure...."

*Marais II*, 24 F. Supp. 3d at 727-728 (emphasis added) (internal citations omitted).

Accordingly, problematic decisions like *Sutton* and *Rosendale*, which misrepresent and misinterpret RESPA, must be addressed and reversed. Additionally, this Court should prescribe a consistent, bright-line standard for all courts in this Circuit regarding pleading actual damages under Section 2605 of RESPA, which should include the out-of-pocket costs to prepare and mail

information requests under 12 U.S.C. § 2605(e) and 12 C.F.R. § 1024.36, where a servicer fails to respond, or where the response is incomplete or insufficient. *See, e.g.*, *Midouin v. Downey Sav. & Loan Ass'n, F.A.*, 834 F. Supp. 2d 95, 112-113 and n.21 (E.D.N.Y. 2011) ("The court finds that plaintiff has sufficiently alleged that she suffered damages, including but not limited to a loss of savings and income, caused by defendants' purported RESPA violations." (collecting cases regarding actual damages including expenses for preparing, photocopying, and obtaining certified copies of correspondence)); *Jackson*, 2019 WL 3426240, at *8 ("Costs incurred after an incomplete or insufficient response may be recoverable under RESPA . . . ."); *Jackson v. Bank of Am., N.A.*, No. 16-CV-787 (FPG), 2017 WL 5598856, at *6 (W.D.N.Y. Nov. 21, 2017) ("In addition to late fees, Plaintiffs allege they incurred administrative costs 'such as postage, photocopying, scanning, and travel expenses that they would not have incurred if' Defendant had complied with RESPA, as well as 'lost time and inconvenience' and a 'ruined credit score.' Many courts have held that these sorts of damages are recoverable under RESPA." (internal citation omitted)); *Inorio v. Wells Fargo Bank, N.A.*, 522 F. Supp. 3d 417, 422 (N.D. Ill. 2021) (holding that damages for the costs of preparing additional QWRs, which would have been unnecessary if defendant properly responded to prior requests, "are sufficient to state a claim under RESPA"); *Tanasi*, 257 F. Supp. 3d at 271 (declining to dismiss RESPA claims asserting "damages stemming from the preparation of later

requests, or of notices of error that [plaintiffs] would not have needed to prepare but for [servicer's] alleged violations," finding that "[c]osts incurred after an incomplete or insufficient response are recoverable under RESPA"); *Fowler v. Bank of Am., Corp.*, 747 F. App'x 666, 671 (10th Cir. 2018) (noting "if [a servicer's] nonresponse or inadequate response prompted the [plaintiff] to resend a QWR, then the costs of preparing the subsequent QWR are indeed traceable to the [RESPA] violation"); *McCray v. Fed. Home Loan Mortg. Corp.*, No. 13-CV-1518 (GLR), 2014 WL 293535, at *14 (D. Md. Jan. 24, 2014) ("McCray alleges she accrued expenses in her attempts to receive responses to her QWRs, including sending certified mail, traveling to and from the post office, copying documents, and researching information. These expenses are recoverable under RESPA and are sufficiently alleged."), *aff'd in part, rev'd in part on other grounds and remanded,* 839 F.3d 354 (4th Cir. 2016); *Becker v. PennyMac Loan Services, LLC*, 583 F. Supp. 3d 1090, 1100 (S.D. Ohio 2022) ("[A]ll expenses, costs, fees, and injuries fairly attributable to [the servicer's] failure to respond appropriately to the QWR, even if incurred before the failure to respond, are included [in the damages recoverable under RESPA]."); *Carilus v. United Wholesale Mortg., LLC*, No. 24-CV-546(JA)(PRL), 2025 WL 2917135, at *5 (M.D. Fla. Oct. 14, 2025) (holding that "a plaintiff 'may seek as actual damages photocopying costs, postage costs, and reasonable attorney's

fees incurred as a result of having to send additional correspondence due to Defendant's failure to respond.'" (citation omitted)).

## II. THE DISTRICT COURT FURTHER ERRED IN CONCLUDING THAT THE SERVICERS' CHARGING OF ACCRUED INTEREST ON ERRONEOUS FEES ADDED TO MURRAY'S LOAN BALANCE, WHILE REFUSING TO PROVIDE A LOAN HISTORY OR OTHER INFORMATION SUBSTANTIATING THE INTEREST CHARGED WHEN REQUESTED, DID NOT CONSTITUTE ACTUAL DAMAGES PROXIMATELY CAUSED BY THE SERVICERS' RESPA VIOLATIONS.

The District Court also partially based its decision on the erroneous conclusion that Murray's claims were an attempt to challenge a prior loan modification, when in fact, she merely sought information from the Servicers to confirm she was being charged the correct amounts. Markedly, inquiries regarding a loan balance and fees added to that balance (and which continue to accrue interest) are absolutely "servicing related" because they relate to the calculation and demand for, and collection of, current and ongoing payments on the loan, which is the servicer's responsibility. Thus, the District Court's finding that "Ms. Murray fails to plead actual damages because the inflated interest charges on the overall balance were caused by a loan modification" (A 542) is incorrect because RESPA's "statutory mechanism makes past errors current by requiring servicers to fix errors they find upon reasonable investigation, including by issuing refunds as necessary. . . . When a plaintiff plausibly alleges that a servicer violated its statutory obligations

and as a result the plaintiff did not receive a refund of erroneous charges, she has been cognizably harmed." *Renfroe*, 822 F.3d at 1246-1247.

The Servicers' refusal to investigate Murray's account upon receipt of the QWRs, to identify and correct errors as required, or to respond and provide so much as a loan transaction history caused actual damages in the form of the accrual of *per diem* interest on erroneous fees that Murray has been unable to remove from her account balance due to the Servicers' RESPA violations. *See Renfroe*, 822 F.3d at 1246-1247 ("When a plaintiff plausibly alleges that a servicer violated its statutory obligations [under RESPA] and as a result the plaintiff did not receive a refund of erroneous charges, she has been cognizably harmed."); *Marais I*, 736 F.3d at 721 ("Marais's complaint sufficiently stated that interest damages flowed from Chase's deficient response to her QWR because any additional interest she paid on the principal balance after Chase deficiently responded to her QWR on February 28, 2011, would flow from the deficient response.").

While the Servicers' failure to respond to the QWRs may not have initially caused improper fees to be added to Murray's account, their RESPA violations have caused any such fees to remain on the account without correction. Notably, this is servicing related, and not modification related as the District Court improperly found. The Servicers' failure to investigate and correct errors upon receipt of the QWRs, or to provide the requested information to allow Murray to send a notice of

error or other correspondence seeking to correct such account errors, caused actual damage because the Servicers continue to demand and collect payments and interest based on an improperly inflated loan balance. This balance includes improper fees that Murray cannot specifically identify or remove because the Servicers refuse to respond to her information requests or give her a loan history. Thus, any interest that has accrued on erroneous fees that Murray has been unable to remove from her account due to the Servicers' failure to respond to her QWRs, constitutes actual damages proximately caused by the Servicers' RESPA violations.

## CONCLUSION

For these reasons, this Court should reverse the Final Dismissal Order to the extent it granted the Servicers' Second MTD and dismissed Murray's SAC without leave to amend based on a failure to allege actual damages, and remand this matter to the District Court to proceed.

Dated: Brooklyn, New York
November 26, 2025

**PETROFF AMSHEN LLP**
*Attorneys for Plaintiff-Appellant,*
Sherry Ann Murray

*/s/ Steven Amshen*
Steven Amshen, Esq.
1795 Coney Island Avenue, Third Floor
Brooklyn, New York 11230
Telephone: (718) 336-4200
Email: samshen@petroffamshen.com

**CERTIFICATION PURSUANT TO**
**Fed. R. App. P. 32(a)(7)(B) and (C)**

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and (C) because the brief contains 9,550 words of text.

The brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2018, Times New Roman, Size 14.

Dated: November 26, 2025
Brooklyn, New York

/s/
Steven Amshen, Esq.

*db*

**CERTIFICATION PURSUANT TO**
**Fed. R. App. P. 32(a)(7)(B) and (C)**

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and (C) because the brief contains 9,550 words of text.

The brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2018, Times New Roman, Size 14.

Dated: November 26, 2025
Brooklyn, New York

/s/
Steven Amshen, Esq.

*db*